TRINA HIGGINS, United States Attorney (#7349)
BRIAN WILLIAMS, Assistant United States Attorney (#10779)
MARK WOLFE, Assistant United States Attorney (Washington #39399)
Attorneys for the United States
111 South Main Street, Suite 1800, Salt Lake City, Utah 84111
Telephone: (801)524-5682

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: INFORMATION ASSOCIATED WITH INSTAGRAM ACCOUNT @KOLETURE THAT IS STORED AT PREMISES CONTROLLED BY META PLATFORMS, INC | CASE NO. 2:24mj1055-DAO AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE |

---

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Jonathan Rich, a Special Agent with the Federal Bureau of Investigation being first

duly sworn, hereby depose and state as follows:

### Introduction and Agent Background

1.      I make this affidavit in support of an application for a search warrant for

information associated with a certain Instagram account @koleture (the "SUBJECT

ACCOUNT") that is stored at premises owned, maintained, controlled, or operated by Meta

Platforms, Inc. ("META"), an electronic communications service and/or remote computing

service provider headquartered in Menlo Park, California.  The information to be searched is

described in the following paragraphs and in Attachment A.  This affidavit is made in support of

an application for a search warrant under 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A), to

require META to disclose to the government records and other information in its possession,

including the contents of communications, pertaining to the subscriber or customer associated

with the SUBJECT ACCOUNT, further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.       I have been a Special Agent with the Federal Bureau of Investigation since 2014.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe violations of 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. §§ 1956 and 1957 (Money Laundering), 18 U.S.C. §§ 371, 1349, and 1956(h) (Conspiracy), and 15 U.S.C §§ 78j(b), 78ff, and 17 C.F.R. § 240.10b-5 (Securities Fraud) have been committed by the following: JERMIAH EVANS, MAKINSEE EVANS, DALLIN PILI, KOLE BRIMHALL, and NOELLE EVANS ("TARGETS").

5.      There is also probable cause to search the SUBJECT ACCOUNT for information described in Attachment A for evidence of these crimes and items to be seized listed in Attachment B.

### Jurisdiction

6.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711 and 18 U.S.C. §§2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is a district court of the United States that has jurisdiction over the offenses being investigated. *See* 18 U.S.C. § 2711(3)(A)(i).

### Probable Cause

#### A.  The TARGETS

7.      Alpha Influence, LLC ("ALPHA") is a Utah limited liability company that was registered with the Utah Division of Corporations and Commercial Code on or about July 22, 2019, through its expiration and voluntary dissolution on or about July 26, 2022. JEREMIAH EVANS was listed as a member and the registered agent for ALPHA. MAKINSEE EVANS was

2

listed as a member of ALPHA from July 2019 until November 2020 under the name Makinsee Williams. Other than JEREMIAH EVANS and MAKINSEE EVANS, there were no other members. The certificate of organization for ALPHA identifies that it was managed by its members. ALPHA described its purpose in its Utah business entity filing as an: "Online platform used to help launch potential clients' businesses.  Counseling and advice for new startup business to help ensure success."

8.    From on or about March 2020 through on or about March 2023, ALPHA portrayed itself as a wealth building company and an "investment firm." ALPHA has multiple affiliated entities including Alpha Automation LLC, Alpha Assets LLC, Alpha Financial, and Alpha's Creed (hereinafter "ALPHA ENTITIES"). Neither ALPHA nor any ALPHA ENTITIES has ever recorded a securities registration, exemption from registration, or notice of filing with the Utah Division of Securities or the United States Securities and Exchange Commission.

9.    JEREMIAH EVANS calls himself "The Bull" and markets his entrepreneurial mentorship, podcast, book, health supplements, and athletic leisurewear. JEREMIAH EVANS purports to be an "Alpha," which he portrays as, among other things, a successful businessman. JEREMIAH EVANS is a social media influencer who, as of March 12, 2024, has approximately 434,000 followers of his personal Instagram account @*thebullevans*. JEREMIAH EVANS regularly creates and posts content to Instagram depicting a public persona of entrepreneurial success to his social media followers and other Instagram users, including regular posts about his success attained through investing with ALPHA. Many of JEREMIAH EVANS posts specifically solicited engagement from his Instagram following by touting his success and encouraged his followers to invest with ALPHA. At no time has JEREMIAH EVANS been licensed in the securities industry.

 

10.     MAKINSEE EVANS is a Utah licensed cosmetologist and the spouse of JEREMIAH EVANS.  MAKINSEE EVANS is an officer, director, or member of several ALPHA ENTITIES, and she identifies herself as a business partner for ALPHA.  MAKINSEE EVANS is a social media influencer with approximately 12,300 followers of her personal Instagram account *@kinseexo* as of March 12, 2024. She has regularly created and posted content depicting herself as a "female Alpha." MAKINSEE EVANS regularly posted to Instagram about the success of JEREMIAH EVANS and ALPHA. She engaged with her Instagram followers by showing a life of leisure and luxury and repeatedly encouraged her followers to invest with ALPHA. At no time has MAKINSEE EVANS been licensed in the securities industry.



11.     From on or about July 2019 through at least July 2022, JEREMIAH EVANS and MACKINSEE EVANS engaged a team of sales agents to sell ALPHA investments in exchange for commissions in an affinity fraud scheme, which is a common scheme where those with affinity or connection, such as followers of social media accounts like Instagram, are targeted and exploited in fraud schemes.

12.     DALLIN PILI was a contracted and top sales agent for ALPHA. DALLIN PILI is a social media influencer with approximately 224,000 people following his Instagram account *@dallinpili.official* as of March 12, 2024. DALLIN PILI regularly created and posted content to Instagram depicting himself as a successful millionaire because of his ALPHA investment, and he used his social media influence to solicit his followers to invest in ALPHA. DALLIN PILI was paid approximately $2.5 million in commissions by ALPHA for "investors" he brought to ALPHA. At no time has DALLIN PILI been licensed in the securities industry.



13.     KOLE BRIMHALL was a contracted and top sales agent for ALPHA.  KOLE
BRIMHALL was a social media influencer with approximately 9,000 people following his
Instagram profile *@koleture* before it was shutdown. KOLE BRIMHALL regularly created and
posted content to Instagram depicting himself as a successful millionaire because of his ALPHA
investment, and he used his social media influence to solicit his followers to invest with ALPHA.
KOLE BRIMHALL was paid approximately $1.2 million in commissions by ALPHA for
"investors" he brought in. At no time has KOLE BRIMHALL been licensed in the securities
industry.



14.     NOELLE EVANS was a contracted and top sales agent for ALPHA. NOELLE
EVANS is a social media influencer with approximately 23,800 people following her Instagram
account *@noelle.evans* as of March 12, 2024. NOELLE EVANS regularly created and posted
content to Instagram depicting herself living a life of leisure and luxury because of her ALPHA
investment, and she used her social media influence to solicit others to invest with ALPHA.
NOELLE EVANS was paid approximately $550,000 in commissions by ALPHA for investors
she brought in. At no time has NOELLE EVANS been licensed in the securities industry.



### B.  The ALPHA Investment

15.     Commencing on or about July 2019 and continuing through on or about July 2022, the TARGETS offered and sold investments in ALPHA to at least 530 investors, resulting in the payment of approximately $20 million in investment funds to ALPHA.

16.     The ALPHA investment offering was described as an Alpha Automation Store where, in exchange for investor funds, ALPHA would *exclusively* manage automated, independently owned Amazon stores for each investor.  An Amazon store was commonly understood to be an online, e-commerce storefront individually owned and operated that sells products on the Amazon platform.

17.     In connection with the ALPHA investment offering, ALPHA and the TARGETS promised investors a return on their initial investment within 12-18 months and a profit-sharing arrangement between the investor and ALPHA for profits generated thereafter.

18.     Many ALPHA investors have been interviewed and confirmed that their investments were solicited by the TARGETS through online public solicitations, posts and content published to various social media platforms, including Instagram, and in-person seminars and/or conventions.

19.     The ALPHA investment offered and sold to investors was an investment contract, which is defined as a security under both Utah and federal law.

20.     Federal securities law limits how a company can connect with potential investors, including, for example and without limitation, under Rule 506(b) of Regulation D, which prohibits the use of general solicitation to market securities. ALPHA and the TARGETS

frequently used Instagram, a publicly available social media platform, to promote the ALPHA investment. At no time has ALPHA made any securities exemption filings or registrations to raise capital through the use of public solicitations.

21.    The TARGETS were not licensed to offer and/or sell securities when they solicited investors to invest with ALPHA, and the TARGETS received compensation therewith.

22.    The ALPHA investment offered and/or sold was an unregistered security, does not appear to qualify for any exemption from registration, and no notice filing was made for this security.

**C.  The Solicitations**

23.     In connection with the offer and/or sale of the ALPHA investment, ALPHA, the ALPHA ENTITIES, and the TARGETS made untrue statements of material facts.

24.    In connection with the offer and/or sale of the ALPHA investment, ALPHA, the ALPHA ENTITIES, and the TARGETS omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading to reasonable investors.

25.    In connection with the offer and/or sale of the ALPHA investment, ALPHA, the ALPHA ENTITIES, and the TARGETS engaged in acts, practices and/or a course of business that operated as a fraud or deceit upon a reasonable investor.

26.    For example, the TARGETS, whether within investment pitch decks, webinars, or social media posts, made numerous misrepresentations to investors regarding the ALPHA investment, including, without limitation, the following:

   a.  That JEREMIAH EVANS came up with the idea to create automated turnkey stores, such as was offered through the ALPHA investment, so that ALPHA can have more stores and investors can benefit by earning passive income.

   b.  That ALPHA had been operating successfully for years.

   c.  That an initial investment of $30k, $35k or $40k with ALPHA would be used to create and open an Amazon automated store for the investor that would be ran and operated exclusively by ALPHA.

    d.   That, in addition to the initial investment funds, investors must also provide additional lines of credit of $15k, $30k or $50k to be used by ALPHA for working capital in its operation of the Amazon automated stores.

    e.   That the return generated through the ALPHA investment would be entirely passive because ALPHA would exclusively manage, operate, select products, price, resell, and ensure order fulfillment.

    f.   That any profits generated by the ALPHA investment, after return on the initial investment principal, would be split with the investor.

    g.   That screenshots published or provided to investors of Amazon store sales and ALPHA testimonials showed proof other investors had millionaire success stories since making their ALPHA investment.

    h.   That the original investment principal would be recouped within 12-18 months.

    i.   That the ALPHA investment would generate, "consistent, predictable, monthly returns."

    j.   That investors could expect to earn passive income of $3k to 7k per month, or up to $10k or more per month, with an average of 7-10% return on investment per month in profit after expenses.

    k.   That there was little to no risk with the investment because Amazon was one of the largest companies in the world and no inventory would be held until an order was placed.

    l.   That ALPHA had connections with high level Amazon executives and/or staff.

    m.   That ALPHA had a legal team that would resolve any issues that arose with Amazon.

    n.   That 10% of all revenue collected from the ALPHA investment by ALPHA through the profit sharing agreements would be donated by ALPHA to Operation Underground Railroad to fight child sex trafficking across the globe.

27.     The investigation has revealed that the TARGETS consistently assured many victims by explaining that their ALPHA investment would result in life-changing passive income where:

    a.   "Everything is done for you."

    b.   "We do all the work."

    c.   "You don't have to do a damn thing."

    d.   "You become the funding partner."

    e.   "All you have to do is partner with us and we take care of everything."

28.     The ALPHA investments did not result in income or return on investment as promised. The TARGETS knew the model was unsuccessful prior to soliciting investors based, in part, on their own ALPHA investments not returning principal or investment returns.

29.     The TARGETS knew that the ALPHA investment and business model violated Amazon's policies resulting in deactivation of stores and did not disclose this information to prospective investors.

30.     The TARGETS misrepresented how investor funds would be used by telling investors their funds would be used to create an Amazon store. Instead, investor money was primarily diverted to fund commissions for the TARGETS as well the personal lifestyle, including luxury cars, luxury goods, and personal residences of JEREMIAH EVANS and MAKINSEE EVANS.

**D.  The Investors**

31.     At least 530 investors invested approximately $20 million in the ALPHA investment. The majority of investors interviewed have stated that they were introduced to the ALPHA investment through social media online content, including on Instagram.

32.     The majority of investors interviewed have indicated, and review of relevant financial accounts confirms, that they purchased the $40,000 ALPHA investment option that promised a full return on the initial investment within 12-18 months and a 70/30 profit split with ALPHA thereafter.

33.     Once an investor determined to purchase the ALPHA investment, investor funds were sent directly into financial accounts held by ALPHA and controlled by JEREMIAH EVANS and MAKINSEE EVANS.

34.     In exchange for their ALPHA investment, investors received the following:

   a.   Wiring instructions and Service Agreements that were signed by JEREMIAH EVANS on behalf of ALPHA.

   b.   ALPHA Automation Service Agreements outlining that ALPHA is responsible for all management and profit generating efforts.

c. Amazon onboarding instructions from ALPHA on how to create an Amazon seller account with instructions to immediately provide the Amazon seller account information to ALPHA and never "log in again" and never discuss nor mention drop shipping should Amazon inquire.

d. ALPHA sales agreements were provided to some, but not all, investors and included commission amounts that investors could earn from referral sales and terms for non-compete and non-disparagement.

**E. Untrue Statements of Material Facts and Material Misstatements and Omissions**

35.     In connection with the offer and sale of the ALPHA investment security, the TARGETS directly and/or indirectly made untrue statements of material fact and material misstatements or omissions of material facts necessary to make the statements not misleading. For example, and without limitation:

a. That ALPHA had been operating successfully for years when the TARGETS knew that it had not.

b. That the ALPHA investment would generate "consistent, predictable, monthly returns" when the TARGETS knew the investment generated little to no return.

c. That the ALPHA investment principal would be recouped within 12-18 months when the TARGETS knew the investment generated little to no return.

d. That the ALPHA investment would generate an average of 7-10% monthly return on investment in profits after expenses when the TARGETS knew that to be untrue.

e. That ALPHA investment funds would be used by ALPHA to open and operate an Amazon store for investors when, in fact, investment funds were primarily used to compensate and enrich the TARGETS.

f. That Amazon stores would be opened and operated by ALPHA for investors with their investment funds when the TARGETS knew that in many instances no such store was or ever would be opened for investors.

g. That there was reduced risk in the ALPHA investment because of the size, scope, and established nature of Amazon when the TARGETS knew that the ALPHA model violated Amazon's policies.

h. That ALPHA had connections with high-ranking Amazon executives and staff at Amazon's corporate headquarters when, in fact, ALPHA had no such connections.

i. That the initial ALPHA investment funds would be used to open an Amazon store for investors when the TARGETS knew only a fraction, if any, of the initial investment funds would be used for that purpose.

10

j.  That ALPHA employed a legal team and other staff to resolve issues that may arise with the ALPHA investment when the TARGETS knew that ALPHA had minimal office staff and did not employ a legal team or fulfillment team.

k.  That ALPHA would not open and operate the Amazon stores, but would instead outsource funds to a 3rd party service provider without disclosure to investors.

l.  That screenshots of allegedly successful Amazon stores provided to investors were not Amazon stores owned, operated, established, or otherwise associated with ALPHA, but were, in fact, successful stores from other unaffiliated 3rd parties.

m.  That ALPHA was unable to resolve store suspensions and could not get many stores operational again after Amazon had shut down or suspended them.

n.  That several of the testimonials provided in the ALPHA investment pitch were made by close associates and relatives of JEREMIAH EVANS.

o.  That multiple individuals who provided testimonials did not purchase automated Amazon stores through ALPHA.

p.  That multiple individuals who provided testimonials received discounts on their Amazon store purchases and had their stores deactivated without ever receiving a return on their investment principal.

q.  That several individuals who provided testimonials achieved financial success not through Amazon stores obtained through ALPHA investments, but from sales commissions received from the initial investment funds of others.

r.  That return-on-investment earnings of $10,000 or more a month was a very isolated occurrence, if it occurred at all, and not the average.

s.  That the TARGETS were not licensed to sell securities.

36.     Based upon my training and experience, the foregoing factual misstatements and misstatements or omissions of facts necessary not to make statements not misleading would be material to a reasonable investor.

**F.  Fraudulent Conduct: Use of Investor Funds**

37.     As part of the investigation in this matter, several purchasers of the ALPHA investment have been interviewed and reported their understanding that investment funds paid to ALPHA for purchase of the ALPHA investment would be used by ALPHA toward creating the

individual Amazon store for the investor that would generate the return on investment and profits identified in the solicitations.

38.     Generally, the most common initial ALPHA investment was $40,000, though initial investments could range from $30,000 to $50,000. As part of the investigation in this matter, ALPHA's primary financial accounts used for the ALPHA investment have been analyzed for the period between August 2019 and June 2022. That analysis confirms that the ALPHA investment was purchased by at least 530 investor victims with approximately $20 million in initial investor funds being deposited in ALPHA's primary accounts. Analysis of those relevant accounts shows that ALPHA, JEREMIAH EVANS, and MAKINSEE EVANS improperly used initial investor funds in the following manner:

a.  To pay sales commissions of up to $10,000 to unlicensed securities sales agents for the sale of the unregistered ALPHA investment security.

b.  To pay 3rd party automation companies that were not disclosed to investors.

c.  To pay JEREMIAH EVANS and MAKINSEE EVANS to fund their lavish lifestyle.

39.     The largest use of investment funds received by ALPHA was the payment of commissions to ALPHA's unlicensed securities sales agents who were selling the ALPHA investment. In total, approximately $6.75 million, or about 32% of investor funds, was paid as commissions to unlicensed securities sales agents who were selling the ALPHA investment.

40.     DALLIN PILI received approximately $2.5 million in commissions from initial investor funds for his unlicensed sale of the ALPHA investment.

41.      KOLE BRIMHALL received approximately $1.2 million in commissions from initial investor funds for his unlicensed sale of the ALPHA investment.

42.     NOELLE EVANS received approximately $555K in commissions from initial investor funds for her unlicensed sale of the ALPHA investment.

43.     Approximately $6.3 million, or about 30% of initial investor funds, were paid to ALPHA's 3rd party fulfillment partners BLegend Investments and Ecom Partners, who were the entities engaged by ALPHA that were supposed to actually manage and operate Amazon stores

for ALPHA's investors. Neither ALPHA nor the TARGETS disclosed to investors its partnership with 3rd party fulfillment partners.

44.     Approximately $5.3 million, or about 25% of initial investor funds, were used by JEREMIAH EVANS and MAKINSEE EVANS to fund a lavish lifestyle. For example, and without limitation, initial investor funds from ALPHA accounts were used by JEREMIAH EVANS and MAKINSEE EVANS to purchase the following:

   a.  Luxury goods valued at approximately $70,000 from Gentlemen Timepieces out of Dallas, Texas.

   b.  Approximately $250,000 for personal investments in Axia Capital Fund.

   c.  Approximately $320,000 for personal investments in One Mission Nutrition.

   d.  Approximately $250,000 to the Nazarene Fund for production credit on a docuseries entitled "The Hidden War."

   e.  Approximately $161,679 toward the purchase of a personal residence.

   f.  Approximately $300,000 for personal investment with the Kokonut Group.

   g.  Luxury vehicles valued at approximately $550,000.

   h.  Approximately $50,000 for personal investments in WAGS Capital.

45.     Apart from investor funds, no other income came into the ALPHA financial accounts from profits generated by the ALPHA investment.

**G.  Instagram to Promote and Facilitate the ALPHA Investment Scheme**

46.     ALPHA, the ALPHA entities, and the TARGETS regularly used the social media platform Instagram to market, promote, and facilitate the ALPHA investment scheme. Through interviews with the TARGETS and investors it has been learned that each used Instagram to communicate with investors and others about the ALPHA investment scheme.

47.     Several Instagram accounts were used to market, promote, and, ultimately, pitch investors on the ALPHA investment scheme. Those Instagram accounts include, without limitation, the following: *@alphafinancialagency*, *@officialalphainfluence*, *@thealphascreed*, *@thebullevans*, *@kinseexo*, *@dallinpili.official*, *@thereal0mega*, *@koleture*, and *@noelle.evans*.

48.     The following posts were captured from the inactive Instagram account *@alphafinancialagency*, which has been deleted from public view, promoting the fraudulent investment scheme.  These posts advertise the ALPHA investment and make the material misrepresentations that an Amazon store created through the ALPHA investment would generate $3-7k per month. The TARGETS knew that the ALPHA investment did not generate this type of return, if it generated any at all. The posts also indicate that the cost of the initial investment would be going up in March 2022, even though the TARGETS knew, and did not disclose, that the ALPHA investment was not sustainable, and Amazon was shutting down the Amazon stores for violation of its policies.

 

49.     The following deleted posts were captured from the inactive Instagram account *@officialalphainfluence*, promoting the fraudulent investment scheme.  These marketing posts make material misrepresentations or omissions about the investment. The TARGETS knew that the ALPHA investment did not produce the results in all the success screenshots and testimonials. The TARGETS knew that ALPHA did not employ a team of experts to manage the Amazon store. The TARGETS knew a return on investment would not be earned in 12-18 months.





50.     The following deleted posts were captured from the active Instagram account *@thealphascreed* promoting the ALPHA investment scheme and making materially false earnings claims.   These posts make additional material misrepresentations or omissions about the ALPHA investment including, without limitation, that there was no "Alpha Automation team;" that the ALPHA investment was an unregistered security; that investors were not earning 6-7 figure returns; and that the revenue from product sales listed does not equate to retained profits paid to the investor.



51.     The following posts were captured from active Instagram accounts *@thebullevans*, *@realbullevans* and *@therealbullevans* making materially false and misleading claims, including, without limitation, that product sales reported for making $22k in one week were not returns paid to an investor; that the screenshot for $4.1 million in the image is a self-reported number and not actual retained profits generated from the investment; and that JEREMIAH EVANS has an investment firm when, in fact, he does not.

  

52.     The following posts captured from active Instagram accounts, *@thebullevans*,

*@realbullevans* and *@therealbullevans*, reposting the same or similar marketing content, contain

material misrepresentations or omissions about JEREMIAH EVANS success derived from

ALPHA including, without limitation, that JEREMIAH EVANS paid to be featured in Forbes;

that the $120,000 watch worn in the video was purchased using misappropriated ALPHA

investor funds; that JEREMIAH EVANS used ALPHA business accounts for his personal

expenses; and that his "millionaire" status was derived from the unlicensed sale of the

unregistered ALPHA investment security and not profits derived from the ALPHA investment.

  

53.     The following posts captured from active Instagram account @*kinseexo*, the SUBJCT ACCOUNT, contain materially false misrepresentations or omissions including, without limitation, that people who have invested in ALPHA found financial freedom, and that ALPHA was donating a portion of its revenue to OUR Rescue monthly.





54.     The following deleted stories and posts were captured from active Instagram accounts *@dallinpili.official* and *@thereal0mega*. These posts make materially false earnings claims about the ALPHA investment and material misrepresentations or omissions including, without limitation: that ALPHA would get everyone verified and approved to sell on Amazon, that the ALPHA investment would create passive income, that the ALPHA investment would generate a return on the initial investment in 12-18 months, and that ALPHA investors would see 4k-7k in passive monthly income. The following posts also expressly invite potential investors to send a direct message to the account holder to "set up a call" regarding the ALPHA investment.





55.     The following are deleted screenshots of a tagged Instagram reel and deleted video posts captured from an inactive Instagram account @*koleture*, the SUBJECT ACCOUNT, making earnings claims about the ALPHA investment.  TARGET KOLE BRIMHALL is featured in the testimonial video posted to his Instagram page stating:

> "…I am now making more money now than I ever thought possible. That year that I was working full time construction I made 25 grand. In this month alone, I made way more than that. That should put in perspective how much money you can make, how much there is available for you to be able to live the life of your dreams, not have to be held back by society's plan. Come join us, come be a part of this Alpha influence movement."

These posts make material misrepresentations or omissions about the ALPHA investment. For example, and without limitation, the money KOLE BRIMHALL made was from the commissions he was paid by ALPHA for the unlicensed sale of the unregistered ALPHA investment to others, not from his own ALPHA investment. The investigation has revealed that KOLE BRIMHALL never earned a return on his own ALPHA investment.



56.     The following deleted posts were captured from active Instagram account @*noelle.evans* making earnings claims about the ALPHA investment. These posts make material

misrepresentations or omissions. The money NOELLE EVANS made was from commissions received for the unlicensed sale of the unregistered ALPHA investment and came directly from investor funds, not profits generated from her investment. Thus far, the investigation has not shown a single investor who generated $40,000 or an average monthly return of $4,000 in passive income from the ALPHA investment.

  

As part of this extensive and pervasive investment fraud scheme, the TARGETS regularly attempted to exploit their Instagram followers by soliciting them to invest with ALPHA. The TARGETS regularly used the Instagram direct messaging feature (DM) as a forum of communication with potential investors. DM communication occurs when an Instagram user clicks, swipes or otherwise responds to a marketing post and engages in communication. The posts soliciting DM responses and the content of these subsequent communications includes additional representations directly from the individual TARGETS about investing. Prospective investors who communicated with the individual TARGETS on the Instagram platform would exchange contact information for a sales discussion.

57.    The following are deleted screenshots seeking DM communication captured from the Instagram account *@thealphascreed*. The posts request that Instagram users DM to engage in further communication about the investment opportunity.

 

58.     The following is a screenshot seeking DM communication captured from the Instagram account @*thebullevans*. Also depicted is a screenshot provided by a victim of DM communication.

 

59.     The following are screenshots of DM communications made through Instagram captured by a victim investor communicating with the account @*kinseexo* about the ALPHA investment offer. The message contains additional guidance and direction about how the ALPHA

investment is to work, including material misrepresentations or omissions that the investment would generate a return in 12 to 18 months.

 

60.     The following are screenshots of DM communications captured by investors made through Instagram to the account *@noelle.evans*.   The messages contain misrepresentations or omissions about the ALPHA investment, including but not limited to, that

ALPHA has a team (it does not), that ALPHA splits profits every month with the investor, and that it was normal for the first year to be slow in generating returns.

 

61.    Since the collapse of the scheme in or around July 2022, Instagram accounts *@officialalphainfluence* and *@alphafinancialagency* have been deleted from public view. So too, Instagram account *@thealphascreed* removed all ALPHA investment related posts from its account. KOLE BRIMHALL'S Instagram account *@koleture* has been deleted. Since being informed they were under investigation by the Utah Division of Securities in November 2023, JEREMIAH EVANS, DALLIN PILI, and NOELLE EVANS have deleted several ALPHA related stories, reels and posts form their accounts. They have also removed themselves from keyword tagged posts relating to marketing of the ALPHA investment scheme.

**Background Concerning Instagram[1]**

_____

[1] The information in this section is based on information published by META on its Instagram website, including, but not limited to, the following webpages: "Privacy Policy,"

62.     Instagram is a service owned by META, a United States company and a provider of an electronic communications service as defined by 18 U.S.C. §§ 3127(1) and 2510. Specifically, Instagram is a free-access social networking service, accessible through its website and its mobile application, that allows subscribers to acquire and use Instagram accounts, like the SUBJECT ACCOUNT listed in Attachment A, through which users can share messages, multimedia, and other information with other Instagram users and the general public.

63.     META collects basic contact and personal identifying information from users during the Instagram registration process.  This information, which can later be changed by the user, may include the user's full name, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, credit card or bank account number, and other personal identifiers.  META keeps records of changes made to this information.

64.     META also collects and retains information about how each user accesses and uses Instagram.  This includes information about the Internet Protocol ("IP") addresses used to create and use an account, unique identifiers and other information about devices and web browsers used to access an account, and session times and durations.

65.     Each Instagram account is identified by a unique username chosen by the user. Users can change their usernames whenever they choose but no two users can have the same usernames at the same time.  Instagram users can create multiple accounts and, if "added" to the primary account, can switch between the associated accounts on a device without having to repeatedly log-in and log-out.

66.     Instagram users can also connect their Instagram and Facebook accounts to utilize certain cross-platform features, and multiple Instagram accounts can be connected to a single Facebook account.  Instagram accounts can also be connected to certain third-party websites and

---

https://privacycenter.instagram.com/policy/; "Information for Law Enforcement," https://help.instagram.com/494561080557017; and "Help Center," https://help.instagram.com.

mobile apps for similar functionality.  For example, an Instagram user can "tweet" an image uploaded to Instagram to a connected Twitter account or post it to a connected Facebook account, or transfer an image from Instagram to a connected image printing service.  META maintains records of changed Instagram usernames, associated Instagram accounts, and previous and current connections with accounts on META and third-party websites and mobile apps.

67.     Instagram users can "follow" other users to receive updates about their posts and to gain access that might otherwise be restricted by privacy settings (for example, users can choose whether their posts are visible to anyone or only to their followers).  Users can also "block" other users from viewing their posts and searching for their account, "mute" users to avoid seeing their posts, and "restrict" users to hide certain activity and prescreen their comments.  Instagram also allows users to create a "close friends list" for targeting certain communications and activities to a subset of followers.

68.     Users have several ways to search for friends and associates to follow on Instagram, such as by allowing META to access the contact lists on their devices to identify which contacts are Instagram users.  META retains this contact data unless deleted by the user and periodically syncs with the user's devices to capture changes and additions.  Users can similarly allow META to search an associated Facebook account for friends who are also Instagram users.  Users can also manually search for friends or associates.

69.     Each Instagram user has a profile page where certain content they create and share ("posts") can be viewed either by the general public or only the user's followers, depending on privacy settings.  Users can customize their profile by adding their name, a photo, a short biography ("Bio"), and a website address.

70.     One of Instagram's primary features is the ability to create, edit, share, and interact with photos and short videos.  Users can upload photos or videos taken with or stored on their devices, to which they can apply filters and other visual effects, add a caption, enter the usernames of other users ("tag"), or add a location.  These appear as posts on the user's profile.

Users can remove posts from their profiles by deleting or archiving them. Archived posts can be reposted because, unlike deleted posts, they remain on META's servers.

71.    Users can interact with posts by liking them, adding or replying to comments, or sharing them within or outside of Instagram. Users receive notification when they are tagged in a post by its creator or mentioned in a comment (users can "mention" others by adding their username to a comment followed by "@"). An Instagram post created by one user may appear on the profiles or feeds of other users depending on a number of factors, including privacy settings and which users were tagged or mentioned.

72.    An Instagram "story" is similar to a post but can be viewed by other users for only 24 hours. Stories are automatically saved to the creator's "Stories Archive" and remain on META's servers unless manually deleted. The usernames of those who viewed a story are visible to the story's creator until 48 hours after the story was posted.

73.    Instagram allows users to broadcast live video from their profiles. Viewers can like and add comments to the video while it is live, but the video and any user interactions are removed from Instagram upon completion unless the creator chooses to send the video to IGTV, Instagram's long-form video app.

74.    Instagram Direct, Instagram's messaging service, allows users to send private messages to select individuals or groups. These messages may include text, photos, videos, posts, videos, profiles, and other information. Participants to a group conversation can name the group and send invitations to others to join. Instagram users can send individual or group messages with "disappearing" photos or videos that can only be viewed by recipients once or twice, depending on settings. Senders can't view their disappearing messages after they are sent but do have access to each message's status, which indicates whether it was delivered, opened, or replayed, and if the recipient took a screenshot. Instagram Direct also enables users to video chat with each other directly or in groups.

75.    Instagram offers services such as Instagram Checkout and Facebook Pay for users to make purchases, donate money, and conduct other financial transactions within the Instagram

platform as well as on Facebook and other associated websites and apps.  Instagram collects and retains payment information, billing records, and transactional and other information when these services are utilized.

76.     Instagram has a search function which allows users to search for accounts by username, user activity by location, and user activity by hashtag.  Hashtags, which are topical words or phrases preceded by a hash sign (#), can be added to posts to make them more easily searchable and can be "followed" to generate related updates from Instagram.  META retains records of a user's search history and followed hashtags.

77.     META collects and retains location information relating to the use of an Instagram account, including user-entered location tags and location information used by META to personalize and target advertisements.

78.     META uses information it gathers from its platforms and other sources about the demographics, interests, actions, and connections of its users to select and personalize ads, offers, and other sponsored content.  META maintains related records for Instagram users, including information about their perceived ad topic preferences, interactions with ads, and advertising identifiers.  This data can provide insights into a user's identity and activities, and it can also reveal potential sources of additional evidence.

79.     In some cases, Instagram users may communicate directly with META about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like META typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

80.     For each Instagram user, META collects and retains the content and other records described above, sometimes even after it is changed by the user (including usernames, phone numbers, email addresses, full names, privacy settings, email addresses, and profile bios and links)

81.     In my training and experience, evidence of who was using Instagram and from where, and evidence related to criminal activity of the kind described herein, may be found in the files and records described above.  This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

82.     For example, the stored communications and files connected to an Instagram account may provide direct evidence of the offenses under investigation.  Based on my training and experience instant messages, voice messages, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

83.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by META can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, subscriber information, such as messaging logs, photos, and videos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the account at a relevant time.  As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account.  Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

84.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation.  For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

85.      Other information connected to the use of Instagram may lead to the discovery of additional evidence.  For example, associated and linked accounts, stored communications, photos, and videos may reveal services used in furtherance of the crimes under investigation or services used to communicate with other TARGETS and/or co-conspirators.  In addition, stored communications, contact lists, photos, and videos can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

86.      Therefore, META's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Instagram.  In my training and experience, such information may constitute evidence of the crimes under investigation.

87.      On January 25, 2024, a preservation request was served to Instagram pursuant to 18 U.S.C. § 2703(f), requiring Instagram to preserve all information associated with the SUBJECT ACCOUNT.

88.      Based on the information above, META is likely to contain all the material described above with respect to the SUBJECT ACCOUNT, including stored electronic communications and information concerning subscribers and their use of Instagram, such as account access information, which would include information such as the IP addresses and devices used to access the account, as well as other account information that might be used to identify the actual user or users of the account at particular times.

## Conclusion

89.      Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities of violations, or attempted violations, of 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. §§ 1956 and 1957 (Money Laundering), 18 U.S.C. §§ 371, 1349, and 1956(h) (Conspiracy), and/or 15 U.S.C §§ 78j(b), 78ff, and 17 C.F.R. § 240.10b-5 (Securities Fraud) may be located in the SUBJECT ACCOUNT identified in Attachment A.

90.     Accordingly, I respectfully request that the Court issue the proposed search warrant.

91.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on META. Because the warrant will be served on META, who will then complete the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,


Jonathan Rich
Special Agent
Federal Bureau of Investigation


SUBSCRIBED and SWORN to before me on October 30, 2024


DAPHNE OBERG
United States Magistrate Judge

31

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Instagram account *@koleture* (active on, but not limited to July 2019), that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized

**I.     Information to be disclosed by Meta Platforms, Inc. ("META")**

To the extent that the information described in Attachment A is within the possession, custody, or control of META, regardless of whether such information is located within or outside of the United States, and including any messages, records, files, logs, or information that have been deleted but are still available to META, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on January 25, 2024, META is required to disclose the following information to the government for each account listed in Attachment A:

    A.    All business records and subscriber information, in any form kept, pertaining to the account, including:

        1.    Identity and contact information (past and current), including full name, e-mail addresses, physical address, date of birth, phone numbers, gender, hometown, occupation, websites, and other personal identifiers;

        2.    All Instagram usernames (past and current) and the date and time each username was active, all associated Instagram and Facebook accounts (including those linked by machine cookie), and all records or other information about connections with Facebook, third-party websites, and mobile apps (whether active, expired, or removed);

        3.    Length of service (including start date), types of services utilized, purchases, and means and sources of payment (including any credit card or bank account number) and billing records;

        4.    Devices used to login to or access the account, including all device identifiers, attributes, user agent strings, and information about networks and connections, cookies, operating systems, and apps and web browsers;

        5.    All advertising information, including advertising IDs, ad activity, and ad topic preferences;

        6.    Internet Protocol ("IP") addresses used to create, login, and use the account, including associated dates, times, and port numbers from July 2019 through July 2022;

        7.    Privacy and account settings, including change history; and

8.    Communications between META and any person regarding the account, including contacts with support services and records of actions taken.

B.    All content (whether created, uploaded, or shared by or with the account), records, and other information relating to videos (including live videos and videos on IGTV), images, stories and archived stories, past and current bios and profiles, posts and archived posts, captions, tags, nametags, comments, mentions, likes, follows, followed hashtags, shares, invitations, and all associated logs and metadata, from July 2019 through July 2022;

C.    All content, records, and other information relating to communications sent from or received by the account from July 2019 through July 2022, including but not limited to:

1.    The content of all communications sent from or received by the account, including direct and group messages, and all associated multimedia and metadata, including deleted and draft content if available;

2.    All records and other information about direct, group, and disappearing messages sent from or received by the account, including dates and times, methods, sources and destinations (including usernames and account numbers), and status (such as delivered, opened, replayed, screenshot);

3.    All records and other information about group conversations and video chats, including dates and times, durations, invitations, and participants (including usernames, account numbers, and date and time of entry and exit); and

4.    All associated logs and metadata.

D.    All content, records, and other information relating to all other interactions between the account and other Instagram users July 2019 through July 2022, including but not limited to:

1.    Interactions by other Instagram users with the account or its content, including posts, comments, likes, tags, follows (including unfollows, approved and denied follow requests, and blocks and unblocks), shares, invitations, and mentions;

2.    All users the account has followed (including the close friends list), unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow, and of users who have followed, unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow the account;

3.    All contacts and related sync information; and

4.    All associated logs and metadata.

E.    All records of searches performed by the account from July 2019 through July 2022.

META is hereby ordered to disclose the above information to the government within **14 days** of issuance of this warrant.

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations, or attempted violations, of 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. §§ 1956 and 1957 (Money Laundering), 18 U.S.C. §§ 371, 1349, and 1956(h) (Conspiracy), and/or 15 U.S.C §§ 78j(b), 78ff, and 17 C.F.R. § 240.10b-5 (Securities Fraud), those violations involving TARGETS Jeremiah Evans, Makinsee Evans, Dallin Pili, Kole Brimhall, and Noelle Evans since July 2019, including, for each username identified on Attachment A, information pertaining to the following matters:

1.    All communications between the TARGETS, sellers, investors, potential investors, and any others made in furtherance of and/or related to the investment scheme and crimes under investigation;

2.    Evidence indicating how and when the account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crimes under investigation and to the Instagram account owner;

3.    Evidence indicating the Instagram account owner's state of mind as it relates to the crimes under investigation;

4.    The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s); and

5.    The identity of the person(s) who communicated with the account holder about matters relating to the investment scheme and crimes under investigation.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed

electronic data to the custody and control of attorneys for the government and their support staff

for their independent review.

### <u>CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)</u>

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by Instagram, LLC, and my title is

_____.  I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of Instagram, LLC.  The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**.  I further state that:

a.        all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Instagram, LLC, and they were made by Instagram, LLC as a regular practice; and

b.        such records were generated by Instagram, LLC's electronic process or system that produces an accurate result, to wit:

1.        the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Instagram, LLC in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by Instagram, LLC, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____    _____

Date                                     Signature